# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| In the Matter of the Search of | )  |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No.   '23 MJ1468 KSC |
| Cricket cellular phone Seizure No. 2023280300008701-007 ("Target Device 3") | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841 | Distribution of a Controlled Substance |
| 21 USC Sec. 846 | Conspiracy to Distribute |
| 21 USC Sec. 848 | Intentionally Killing an Individual In Furtherance of a Drug Trafficking Crime |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Travis Desmond*
*Applicant's signature*

Travis Desmond, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by   telephone   *(specify reliable electronic means)*.

Date:   April 21, 2023

*Judge's signature*

City and state:   San Diego, California      Hon. Karen S. Crawford, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Travis Desmond, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following six cellular phones and one laptop computer:

> White i-Phone
> FPF# 2023280300008701-004
> ("**Target Device 1**")
>
> Blue Samsung cellular phone
> FPF# 2023280300008701-006
> ("**Target Device 2**")
>
> Cricket cellular phone
> FPF# 2023280300008701-007
> ("**Target Device 3**")
>
> Purple i-Phone
> FPF# 2023280300008701-008
> ("**Target Device 4**")
>
> Blue Cricket cellular phone
> FPF# 2023280300008701-009
> ("**Target Device 5**")
>
> Blue Samsung cellular phone
> FPF# 2023280300008701-0039
> ("**Target Device 6**")
>
> Silver Chromebook Computer Laptop
> FPF# 2023280300008701-005
> ("**Target Device 7**")

Collectively, the "**Target Devices**", as further described in Attachments A-1 through A-7, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841, 846, and 848(e)(1)(A)[1] as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Benjamin MADRIGAL ("the Defendant") for conspiring to import and distribute approximately 95.4 kilograms of methamphetamine, 10.00 kilograms of cocaine, and 23.46 kilograms of fentanyl from Mexico into the United States. As set forth below, in the course of this conspiracy

---

[1] 21 U.S.C. § 848(e)(1)(A) provides criminal penalties for intentionally killing an individual in furtherance of a continuing criminal enterprise or in furtherance of an offense punishable under 21 USC § 841.

MADRIGAL shot and killed a co-conspirator and was present when a second co-conspirator was also shot and killed. The **Target Devices** are currently in the custody of Homeland Security Investigations located at 880 Front Street, Suite 3200, San Diego, California 92101.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since December of 2019. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

5. I am currently assigned to a Organized Crime Drug Enforcement Task Force (OCDETF) Strike Force of the Office of the HSI Deputy Special Agent in Charge (DSAC), San Ysidro, California. OCDETF Strike Force identifies the hierarchy and leadership targets of Transnational Criminal Organizations (TCO) and Drug Trafficking Organizations (DTO), and then works to disrupt and dismantle the organizations. Throughout my federal career, I have conducted multiple criminal investigations into violations of federal and state law including, but not limited to, money laundering, bulk

cash smuggling, contraband smuggling, narcotics trafficking, weapons violations, and organized criminal activity. Furthermore, as a federal law enforcement officer, I have submitted affidavits in support of search warrant applications and have been granted search warrants, including search warrants for residences and electronic devices. I have also personally caused the issuance and service of subpoenas in furtherance of criminal investigations and have received and reviewed records in response to the issuance of said subpoenas.

6. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats

and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation and distribution of narcotics, and the killing of other members of the organization, may yield evidence:

   a. tending to indicate efforts to perpetrate, carry out, or conceal the murders of other members of the drug trafficking organization.

   b. tending to indicate efforts to import and distribute controlled substances from Mexico into the United States;

   c. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

   d. tending to identify co-conspirators, criminal associates, or others involved in importation and distribution of controlled substances from Mexico into the United States;

   e. tending to identify travel to or presence at locations involved in the importation and distribution of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

   f. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

   g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

8. As set forth below, there is probable cause to believe that MADRIGAL used the **Target Devices** to manage the importation and distribution of narcotics between June 19, 2021, and April 4, 2023. MADRIGAL himself was arrested transporting narcotics through Oregon on June 19, 2021. He was released on bond and absconded. In August and

September of 2021, while a fugitive from the Oregon arrest, MADRIGAL coordinated the importation and distribution of more than four separate loads of narcotics by four separate individuals. In August and September of 2022, MADRIGAL participated in the murder of two individuals who were also working with this DTO. On April 4, 2023, MADRIGAL was arrested, and agents searched his residence pursuant to a warrant. During that search, agents found the **Target Devices** along with 1.2 pounds of heroin, and three handguns.

9. This investigation originated with the seizure of narcotics from three stolen vehicles at California ports of entry, and one stolen vehicle on a Colorado freeway, between September 9, 2021, and October 18, 2021. The chart below sets forth the drivers, the vehicles, the date and place where drugs were seized, and the type and quantity of drugs:

| Defendant | Vehicle | Date/place drugs Seized | Type/quantity of drugs |
|---|---|---|---|
| Ricardo ALFARO[2] | 2021 Acura RDX[3] | 9/9/21, Otay Mesa POE | 29.84 kgs meth, 5.5 kgs fentanyl |
| Marco BUSTOS[4] | 2019 Dodge Challenger[5] | 10/18/21, San Ysidro POE | 13.00 kgs fentanyl, 10.06 kgs cocaine, .48 kgs. Meth |
| Nicholas PINA[6] | 2020 Ford Mustang[7] | 9/16/21, Grand Junction, CO | 26.8 kgs meth |
| Jaime MALDONADO[8] | 2019 Dodge Ram[9] | 9/28/21, San Ysidro POE | 31.8 kgs meth, 5.34 kgs fentanyl |

10. As noted, each of those drivers has been charged with a narcotics offense in the Southern District of California. Each of these defendants has pled guilty, and each of them has confirmed that they were working for the same DTO. This is corroborated by their common use of stolen vehicles from the same source, their phone downloads, their crossing histories, and wire transfers, which document extensive communication and travel with each other as well as communications with, and payment from, common coordinators.

---

[2] SDCA Case No. 21-CR-2869-CAB.
[3] A blue Acura RDX with license plate No. BM27N15.
[4] SDCA Case No. 21-CR-3211-JLS.
[5] A black Dodge Challenger with license plate No. BM29J99.
[6] SDCA Case No. 22-CR-2700-RBM (currently a fugitive).
[7] A red Ford Mustang with license plate No. BM69E10.
[8] SDCA Case No. 21-CR-3006-BAS.
[9] A silver Dodge Ram with license plate No. BM38F94.

11. I later determined that Fernando GOMEZ, who was arrested on August 5, 2021 (SDCA Case No. 21-CR-2988-AJB) for importing approximately 15 kilograms of methamphetamine from Mexico into the United States, is also associated to this DTO. During a debrief, GOMEZ stated he was recruited by "El Guero" in Visalia, California to smuggle drugs. GOMEZ stated "El Guero" frequented Visalia, CA and Yakima, WA. I later identified "El Guero" as Gilberto ORTIZ.[10] GOMEZ then recruited his friends, BUSTOS and PINA. GOMEZ stated he drove a drug load vehicle to a house Yakima, Washington. ORTIZ died of a drug overdose in the Spring of 2022. As set forth below, witnesses state that following ORTIZ's death, Cesar MURILLO took on leadership responsibilities in Yakima until MURILLO disappeared in early September 2022.

12. As to their common use of stolen vehicles from the same source, each vehicle involved in these seizures bore a temporary California plate at the time it was seized. California Highway Patrol investigators inspected each vehicle and determined that each vehicle bore a VIN that did not match any valid number registered in the United States. Further investigation revealed that each vehicle's VIN number had been changed from the VIN number originally assigned to the vehicle at the factory (commonly referred to as a "VIN switch"). Investigators identified each vehicle's true VIN number and determined each had recently been stolen.

13. Border crossing records show that each of these vehicles made its first entry into the United States within a few weeks prior to the drug seizures driven by Adam PENA. PENA later told agents that he was working for Daniel SOTO, and that SOTO obtained stolen cars in the greater Los Angeles area, sent them down to Mexico to have new VINs installed, and then imported the vehicles back into the United Sates. SOTO is charged with car-theft and drug charges in SDCA Case Number 22-CR-2700-RBM and is currently pending trial. Prior to his indictment, SOTO told agents that he provided the cars to a drug

---

[10] I found ORTIZ's photo inside GOMEZ's cell phone. GOMEZ identified the person in the photo as "El Guero" and I confirmed that the photo matched ORTIZ's Washington State identity card. I also confirmed ORTIZ's identity by interviewing ORTIZ's widow, Yareli BANUELOS, as described below.

trafficking organization. This statement is corroborated by wire transfers sent from MURILLO and Maira HERNANDEZ to SOTO, and by the January 27, 2022, seizure of 56 grams of methamphetamine and three firearms from SOTO's residence.

### Identifying MADRIGAL as the load driver coordinator

14. Pursuant to either a warrant or consent, or both, agents downloaded cellular phones used by ALFARO, BUSTOS, Rafael LOYA (BUSTOS' passenger and co-defendant), PINA, and GOMEZ. Each of those phones had contact with the number (509) 388-4344 (the 4344 number). GOMEZ saved the 4344 number under the contact name Tony@work. Text messages contained in GOMEZ's phone show that the 4344 number provided direction to GOMEZ during successful smuggling runs in the United States prior to GOMEZ's arrest. ALFARO saved the 4344 number as "Mr. T." Text messages in ALFARO's phone show that the 4344 number provided direction to ALFARO during successful smuggling trips prior to ALFARO's arrest. PINA saved the 4344 number as "T." PINA's phone also shows the 4344 number providing direction to PINA during successful smuggling trips prior to PINA's arrest in Grand Junction, Colorado.

15. In addition, between July 32, 2021, and September 16, 2021, the 4344 number exchanged 528 phone calls, text messages, and voice messages with PINA's phone. Between July 22, 2021, and "August 5, 2021, (the day GOMEZ was arrested) the 4344 number exchanged 173 calls, text messages, and voice messages with GOMEZ's phone. Between August 13, 2021, and September 16, 2021, the 4344 number exchanged 111 calls, text messages, and voice messages with BUSTOS' phone. Between August 16, 2021, and August 28, 2021, the 4344 number exchanged 50 calls, text messages and voice messages with ALFARO's phone. The 4344 number also had 16 contacts with the phone believed to be used by ORTIZ, the deceased former leader of the organization in Yakima, Washington, along with numerous other numbers that were also in contact with load drivers and other persons who exchanged wire transfers with members of the organization

16. Many of these communications with the 4344 number specifically reference drug smuggling operations. For example, GOMEZ sent "Mr. T," using the 4344 number,

an image of PINA's driver's license on July 29, 2021, at 2:14 PM. "Mr. T" replied over the 4344 number and said "they are going t pay 6 per car to nic my old man." Which corresponds to the load driver's statements that they were paid $6,000 per loaded vehicle. ALFARO's phone also revealed several communications between ALFARO and "Mr. T" over the 4344 number. On September 3, 2021, ALFARO sent an image of his driver's license to "Mr. T" who replied, "Dude is the address on the ID your actual address? Because the car title will get to that address." I believe that this is a reference to the vehicle registration being mailed to ALFARO. ALFARO said that in addition to cash payments, he was going to receive a car for his services. PINA's phone also revealed several communications between PINA and "Mr. T" using the 4344 number. On September 4, 2021, PINA texted the 4344 number: "Dude I got someone who wants to buy 1,000 blues [fentanyl pills[11]] for $2,000." The 4344 number responds: Ok dude grab the ones in the yellow bag."

17. Three sources of evidence tie Benjamin MADRIGAL to the 4344 number. First, as set forth below, he has admitted that he organized this operation. Second, during an interview, CS2 (described further below) stated that she contacted MADRIGAL on the 4344 number on numerous occasions in 2021. CS2 is Mayra HERNANDEZ's daughter and was formerly in a relationship with MADRIGAL. Third, GOMEZ's (one of the load drivers) phone had a photo of a Washington state driver's license with MADRIGAL's photo bearing the name "Sebastian Torres." Subpoenas served on Money Gram show that on September 21, 2021, "Sebastian Torres" used the 4344 number to send a $1,000 wire to Raquel Madrigal, MADRIGAL's sister.

18. MADRIGAL is currently charged in the District of Oregon (Case No. 22-CR-76) with possession with intent to distribute fentanyl and methamphetamine and is a fugitive from that case. He was arrested on June 19, 2021, as the passenger in a vehicle that contained approximately 55 pounds of methamphetamine, 953 grams of cocaine, and one

---

[11] My interpretation of coded language is set forth in brackets, and is based on my training, experience, and knowledge of this investigation.

kilo of fentanyl. MADRIGAL was initially charged in state court. He failed to appear and has been a fugitive since that time. He was indicted in the District of Oregon on March 3, 2022.

**CS1 states that Benjamin MADRIGAL killed MURILLO and HERNANDEZ**

19.  On December 8th, 2022, Agents conducted a proffer with a Confidential Source (CS1). CS1 was previously linked to this DTO and investigation after their name was discovered on an insurance card from a seized Infiniti Q50 in Yakima, WA that was used by this DTO. CS1 was arrested by DEA Stockton in California in the fall of 2022 for distributing narcotics. CS1 told investigators that they had information about a murder that occurred in Yakima, WA after agents conducted several warrants in the area.

20.  CS1 said MADRIGAL took over leadership of the DTO after the death for former leader, ORTIZ. CS1 identified ORTIZ and MADRIGAL from a photo lineup. Agents showed CS1 a picture of MURILLO. CS1 identified MURILLO as a former member of the DTO and said MURILLO was murdered in Yakima, Washington in September 2022.

21.  CS1 said that Benjamin MADRIGAL called them (CS1) approximately 30 minutes after killing MURILLO and his spouse, HERNANDEZ. According to CS1, MADRIGAL said that it all started after HERNANDEZ's daughter, CS2, contacted MADRIGAL through a cellular phone to inform MADRIGAL that MURILLO was talking to law enforcement. (I interviewed MURILLO and HERNANDEZ on August 22 and 23, 2022.) After MADRIGAL heard this, MADRIGAL confronted MURILLO. MADRIGAL met with MURILLO, searched MURILLO's cell phone, and found text messages between MURILLO and HERNANDEZ discussing how they were going to cooperate with law enforcement and potentially give law enforcement Benjamin MADRIGAL's location. After seeing this, MADRIGAL became enraged and drove MURILLO to a ranch outside of Yakima.[12]

---

[12] Agents served a federal search warrant on the property on September 8, 2022, and seized over 30 assault rifles.

22. CS1 said that Benjamin MADRIGAL told them, CS1, that once at the ranch, Ricardo ORIZABA likely shot MURILLO to death with an AK-47 assault rifle. Ricardo ORIZABA did this at MADRIGAL's direction. CS1 said that Ricardo ORIZABA does of all MADRIGAL's "dirty work" and that Benjamin MADRIGAL told them Ricardo ORIZABA was the shooter. CS1 said that there were other people there who witnessed the murder, but he did not provide their names. Agents showed a picture of Ricardo ORIZABA that was taken during the surveillance in Wapato, WA. CS1 confirmed the person in the photograph was Ricardo ORIZABA.

23. CS1 also said that after Ricardo ORIZABA killed MURILLO, Benjamin MADRIGAL contacted HERNANDEZ in order to get her to come to the ranch style property to meet MURILLO. CS1 said that Benjamin MADRIGAL used a "ruse" to get HERNANDEZ to the ranch. Once HERNANDEZ was at the ranch, Ricardo ORIZABA shot HERNANDEZ to death with the same AK-47 style assault rifle. Benjamin MADRIGAL, ORIZABA, and other unknown coconspirators used a commercial grade backhoe to bury the bodies deep underground. Then they used the backhoe to move large amounts of dirt around the property to make it more difficult for the bodies to be recovered. (During the search warrant on September 8, 2022, agents observed a commercial grade backhoe located on the property). Agents asked CS1 if the weapon used to murder HERNANDEZ and MURILLO was seized by agents during the search warrant and CS1 stated "no," ORIZABA had concealed the firearm in a separate area.

24. CS1 stated that the ranch was used to store, weigh, separate, package and distribute narcotics. Vehicles containing concealed narcotics would drive to the ranch and have the narcotics removed from the vehicles and stored on site until it was distributed. CS1 stated he had visited the ranch style property numerous times and had first-hand knowledge of the purpose of its location.

### CS2's Interview

25. CS2 substantially corroborated CS1's version of events. CS2 told agents that after MURILLO went to the ranch, MADRIGAL asked [CS2] to take their mother, Mayra

HERNANDEZ, to a hotel parking lot in Yakima, Washington where he would take her to a nearby residence. CS2 drove their mother, Mayra HERNANDEZ, to the hotel where MADRIGAL was waiting. Mayra HERNANDEZ got into MADRIGAL's car. However, rather than drive in the direction of the residence, CS2 saw MADRIGAL take their mother in the direction of the ranch outside of Yakima. That was the last time CS2 saw their mother, Mayra HERNANDEZ. That interview occurred on September 9, 2022. At that time, CS2 believed that HERNANDEZ and MURILLO fled to Mexico. However, they have not heard from their mother since that time.

26. CS2 also stated that they were living with MURILLO and HERNANDEZ during the summer of 2022, and they would often see MURILLO unloading and weighing drugs at their home in Yakima, Washington. CS2 saw them handle large amounts of a substances that they described as crystal like substances, white powder, and blue pills. Based on conversations they heard in their home and on statements from their mother, HERNANDEZ, CS2 understood that HERNANDEZ and MURILLO would earn $14,000 from each shipment of drugs.

### Arrest and interview of MADRIGAL

27. On April 4, 2023, law enforcement executed five residential search warrants in Reedley, California. During the execution of the search warrants, MADRIGAL attempted to flee from one of the residences and was detained. Agents confirmed MADRIGAL was currently wanted out of the District of Oregon after failing to appear for his judicial proceedings. Agents then searched the property and found 1.2 pounds of heroin, three handguns, miscellaneous ammunition, and miscellaneous notebooks that appeared to be drug sale ledgers.

28. Agents informed MADRIGAL he was under arrest and was going to be extradited back to Oregon for his active warrant. During a post-*Miranda* interview, MADRIGAL admitted to coordinating load drivers GOMEZ, BUSTOS, PINA, LOYA and ALFARO during their drug smuggling events. MADRIGAL would use his cell phone to provide addresses to the load drivers so they would know where to deliver the drugs to.

MADRIGAL admitted to knowing the load vehicles were stolen and taken to Mexico so the VINs could be altered to avoid detection from law enforcement. MADRIGAL stated "Danny" [Daniel SOTO] from Los Angeles was the auto theft supplier to MADRIGAL and the DTO, and SOTO knew MURILLO from prison. MADRIGAL admitted to coordinating Jose Orizaba and Benito Madrigal who were arrested while driving a stolen Ford Raptor on June 24, 2022.

29. MADRIGAL identified his source of supply of drugs from Mexico. MADRIGAL said he would use his cell phone to communicate with that source of supply. MADRIGAL also admitted to using his cell phone to coordinate the drugs from the border to Los Angeles and then to Yakima, Washington. MADRIGAL stated the drugs were cocaine, methamphetamine and fentanyl and were smuggled into the United States from Mexico through San Diego Ports of Entry and were concealed in passenger cars, or the cargo of semi-trucks. The primary concealment method in semi-trucks was to hide the drugs in oil tank barrels.

30. MADRIGAL stated he would physically change his cell phone every two weeks to avoid detection from law enforcement. MADRIGAL would transfer the phone contents from his old cell phone to his new cell phone, which included phone numbers, messages, and data.

31. MADRIGAL admitted to killing Cesar MURILLO. MADRIGAL stated that he killed MURILLO in self defense on or about August 25, 2022, in Yakima, Washington. MADRIGAL stated he shot MURILLO to death with an AK-47 assault rifle on a ranch after MURILLO tried to shoot him. Another co-conspirator then buried MURILLO's body with a backhoe. Approximately two days later, MADRIGAL picked up Maira HERNANDEZ and brought her to the ranch. HERNANDEZ was then shot and killed by "Chino." MADRIGAL then buried HERNANDEZ's body next to MURILLO.

32. The **Target Devices** were found in the residence and on the property used by MADRIGAL. **Target Device 1** is a white iPhone cell phone and was found on MADRIGAL's bed. **Target Device 2** is a blue Samsung cell phone and was found on a

nightstand next to MADRIGAL's bed. **Target Device 3** is a Cricket cell phone and was found on the person of Fernando Lopez inside MADRIGAL's residence.[13] **Target Device 4** is a purple iPhone and was found on MADRIGAL's bed. **Target Device 5** is a blue Cricket cell phone and was found in the top drawer of a dresser in MADRIGAL's room. **Target Device 6** is a blue Samsung cell phone and was found in a manmade, underground void outside of MADRIGAL's residence but on the property. Inside the manmade void was a black and red bag. Within the bag was **Target Device 6**, a Glock 23, several extended Glock magazines and two ledgers. **Target Device 7** is a silver Chromebook computer laptop and was found on a nightstand next to MADRIGAL's bed.[14]

33. MADRIGAL stated he had two cell phones located in the residence that belonged to him, a purple iPhone (**Target Device 4**) and a black Samsung. During the search of MADRIGAL's residence, there were only two Samsung cell phones found and both were blue, not black.

---

[13] LOPEZ said he was a caretaker for the property who lived at the property and stated that he rented a room to MADRIGAL's girlfriend. Although LOPEZ is not the subject of this investigation, there is probable cause to search the phone that he had on his person. I know based on my training and experience that it is common for individuals who are about to be caught with evidence of a crime to transfer the evidence to other persons. In this case, there was a period of three to five minutes between when officers appeared at the scene in front of MADRIGAL's residence before they made entry. During this time, MADRIGAL jumped out of a window in the rear of the house and attempted to flee on foot. Agents soon caught him and forcibly detained him. Based on the relatively small size of the residence it is likely that MADRIGAL had access to the phone, and based on MADRIGAL's attempt to flee I believe he was aware that his arrest was imminent. For the same reasons he fled, MADRIGAL would attempt to avoid responsibility for the evidence on his phone by transferring it to another person.

[14] A Chromebook is a portable computer running ChromeOS. They tend to have lower-powered processors, less RAM, and less local storage than their laptop counterparts. Based on the layout of MADRIGAL's bedroom, and the location of **Target Device 7**, i.e. on a nightstand next to MADRIGAL's bed and not on a desk, I believe that MADRIGAL used Target Device 7 mostly to consume entertainment content and for light messaging and storing small files. I believe that MADRIGAL used this device more like a cellular phone than a computer, and hence I believe the methodology applicable to cellular phones is more appropriate for analyzing this device than those for a computer.

34. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Devices** to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on June 21, 2021, up to and including April 4, 2023.

## METHODOLOGY

35. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.

Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

36. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

37. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

38. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//
//
//
//
//
//

## CONCLUSION

39. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of MADRIGAL's violations of Title 21, United States Code, Sections 841, 846 and 848(e)(1)(A). Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Travis Desmond, SA*

Special Agent Travis Desmond
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 20th day of April, 2023.

_____
Honorable Hon. Karen S. Crawford
United States Magistrate Judge

## ATTACHMENT A-3

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Cricket cellular phone
>Seizure No. 2023280300008701-007
>**("Target Device 3")**

The Target Device is currently in the possession of Homeland Security Investigations, located at 880 Front Street, Suite 3200, San Diego, California 92101.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 21, 2021, up to and including April 4, 2023:

a. tending to indicate efforts to perpetrate, carry out, or conceal the murders of other members of the drug trafficking organization.

b. tending to indicate efforts to import and distribute controlled substances from Mexico into the United States;

c. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

d. tending to identify co-conspirators, criminal associates, or others involved in importation and distribution of controlled substances from Mexico into the United States;

e. tending to identify travel to or presence at locations involved in the importation and distribution of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

f. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, Sections 841, 846, and 848(e).